**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK STUKES,** | : | **CIVIL NO:4:10-CV-24** |
| | : | |
| **Petitioner,** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **RAYMOND LAWLER, et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.   Introduction

This case presents a child's nightmare, an horrific scene. On July 11, 2004, a young boy, TG, awoke to find his mother dead, bludgeoned and strangled in her bedroom in the home she shared with TG, his little sister, and her boyfriend, Mark Stukes. Downstairs, TG was confronted by his mother's killer, her estranged boyfriend, Mark Stukes, who asked TG if he had gone into his mother's room, and threatened to kill him and his little sister if they dared to venture into the room where his mother lay dead. In the face of this threat, TG quietly crept into his mother's room, covered her body, and kept watch over his sister until Stukes fled.

Convicted of this murder, Stukes now comes before this Court seeking a writ of habeas corpus, arguing that his conviction is not a result of his admitted involvement in the assault that killed this young mother. Instead, Stukes views this

conviction as a fundamental injustice caused by unfair courts and ineffective counsel. On the basis of this assertion–which flies in the face of the evidence and has been consistently rejected by the Pennsylvania courts– Stukes invites us to set aside his conviction.

For the reasons set forth below, it is recommended that this Court decline Stukes' invitation and deny his petition.

## II.   Statement of Facts and of the Case

### A.   The Murder of Rosalyn Denise Hearn

In 2004 Mark Stukes lived with Rosalyn Denise Hearn and her two children in Harrisburg, Pennsylvania. Hearn was the primary breadwinner in this household. Stukes worked only intermittently providing for the household.(Doc. 7. Ex. C, p.423.) By June 2004, Hearn had grown disenchanted with Stukes, and with their relationship. Indeed, by late June 2004 Hearn had confided in her diary that she no longer loved Stukes, and was looking to bring a close to their relationship. (Id., pp.429-33.) Stukes later admitted that he had read Hearn's diary entry, without her knowledge or consent, and that he had been angered and upset by her candid entries describing the dissolution of their relationship.(Id.)

Following this discovery, Stukes' relationship with Hearn followed an angry, tragic and ultimately fatal arc. By mid-summer 2004, Stukes' relationship with Hearn

had deteriorated dramatically, and began to be marked by physically abusive episodes on Stukes' part. Thus, on July 7, 2004, neighbors observed Stukes arguing with Hearn outside their home, an argument punctuated by Stukes shoving Hearn and knocking her to the ground. (Id., pp.242-49.)

This cycle of domestic violence, anger and hostility culminated tragically on the evening of July 10-11, 2004. The hours leading up to Hearn's death began on a promising note, with Hearn and Stukes both attending a family gathering among Hearn's relatives. (Id., pp.179-217.) In the course of the evening, however, this family gathering set the stage for further domestic discord, when Stukes grew jealous and became upset at the attentions shared by Hearn and a male guest at the party.(Id.)A confrontation ensued between Stukes and Hearn, and police were called to quell this domestic disturbance. (Id.) After intervening at the scene, and counseling Hearn and Stukes, police left the party without taking anyone into a custody, a decision that would later yield fatal consequences. (Id.)

Stukes left the party, and returned to the home he shared with Hearn. When Hearn arrived home from the party several hours later, Hearn and Stukes had a confrontation in the upstairs bedroom that they shared in the home. This confrontation degenerated into what Stukes later described as an "assault."(Id., p. 437.) In the course of this assault, Hearn was knocked to the floor of the bedroom.

(Id., pp.329-68, 421-43.) Her skull was fractured by hammer blows, (id., pp.108-46), and an electrical cord was wrapped tightly around her throat multiple times, crushing her throat and resulting in her strangulation (id.).

For his part, Stukes later admitted physically restraining Hearn on the floor of the bedroom until she lost consciousness and grew "quiet." (Id., p.473.) Stukes then claimed to have left the home and wandered down to the riverbank in Harrisburg. There, consumed by "guilt," Stukes made a half-hearted effort to take his own life by inflicting superficial wounds to his wrists.(Id., p. 413.) Failing in this effort, Stukes returned to the apartment which he shared with Hearn and her children.

For the next twenty-four hours, from July 11 through July 12, 2004, Stukes indulged in a macabre masquerade. When one of Hearn' relatives stopped by to visit, Stukes denied her entry into the home and claimed that Hearn was not at home. (Id. p.188.) Instead, while Hearn lay dead in the upstairs bedroom of the apartment, Stukes and Hearn' two children remained downstairs in the home.  (Id., pp. 221-242.)Throughout the day, Stukes engaged in erratic behavior with the children. (Id.) At times, he was indulgent, allowing the two children to eat snacks, watch movies and play video games. (Id.) At other times, he was persistently inquisitive, closely questioning the children regarding whether they had ventured into their mother's bedroom. (Id.) On yet other occasions, Stukes was overtly threatening, telling the

4

children that he would kill them if they went upstairs and looked into the bedroom where Hearn lay dead. (Id.)

In fact, the children had discovered their mother's body. Hearn' son, TG, had found his mother's corpse on the morning of July 11. He had covered her body with a blanket because the sight of her lifeless form had upset his little sister. (Id., p.224-5.) Throughout July 11, TG  parried Stukes' inquiries regarding his mother's bedroom, and denied going into the bedroom out of fear of what Stukes might do if he learned that the children knew of their mother's death. (Id., pp.226-7.) TG also kept vigil on the evening of July 11, staying awake through the night as his sister and Stukes slept. (Id., p.235.)

On July 12, 2004, Stukes fled. After dropping Hearn' children off with a babysitter, (id., pp.267-274), Stukes canvassed the neighborhood, approaching various neighbors, and lying to them, stating that he was trying to borrow bus fare to Philadelphia so he could see his son who was sick (id., pp.278-308).  By the afternoon of July 12, Stukes had gathered bus fare and boarded a bus for Philadelphia, abandoning Hearn's children, and leaving Hearn dead in the bedroom that they had shared.

Stukes' decision to make no provision for these children after killing their mother proved to be his undoing. When no one arrived to pick the children up from

the baby-sitter, Hearn' family began seeking her out. (Id., pp.37-78.) By July 13, the family had contacted the police, who entered Hearn' home, and found her body, as well as a blood-covered hammer, in the apartment.(Id.)

Police also began a manhunt for Stukes, a manhunt that culminated on July 15, 2004, with Stukes' arrest in Philadelphia.(Id., pp.302-78.) Taken into custody, Stukes initially spun a fabric of lies for police. (Id.) When police took Stukes into custody, he had minor wounds on his arms and legs. (Id.)Stukes initially denied any knowledge of Hearn's death, and claimed that the wounds were the result of a robbery by unknown assailants which occurred on July 11, 2004, at the very time of Hearn's murder. (Id.)  Stukes later recanted this statement, and admitted that he and Hearn had a violent confrontation in the apartment bedroom, a confrontation that ended when Hearn grew "quiet" as she was restrained by Stukes. (Id.) Yet even as Stukes admitted lying to police, and changed his story regarding what had transpired on July 11, police discovered that Stukes' new story was riddled with contradictions. For example, while Stukes admitted engaging in a physical altercation with Hearn, he could not explain how Hearn came to be strangled by an electrical cord.(Id., pp.421,43.) Moreover, Stukes claimed that Hearn assaulted him with the hammer found in her apartment, but could not explain to police how Hearn suffered skull

fractures from hammer blows. (Id.) Nor could Stukes explain why Hearn's blood was found on the hammer, if he had never struck her with that weapon. (Id.)

## B.   The Trial and Conviction of Mark Stukes

Charged with the murder of Rosalyn Denise Hearn, Stukes proceeded to trial on this murder charge. In preparation for this trial, on February 10, 2005, the trial judge conducted a hearing regarding whether Hearn's son, TG, could testify via closed-circuit television.(Doc. 7. Ex. B.)

At this hearing TG, his father, his teachers, and his therapist all testified, providing compelling testimony regarding the fears that racked TG, fears driven by his nightmarish experience on July 11, 2004, as this boy discovered his mother's body, and found himself in the home with her corpse, and her killer, a killer who questioned TG regarding whether he had been in his mother's room, and threatened to kill TG and his sister if they ventured into the bedroom where their mother lay dead. (Id.) At the close of this testimony, the trial judge ruled that TG would be permitted to testify via closed circuit television to avoid the trauma of confronting his mother's killer in court, and reliving these events. (Id.)

Stukes proceeded to trial on February 14-18, 2005. (Doc. 7. Ex. C.) At the outset of the trial, Stukes sought to continue his case, or secure the appointment of new counsel. (Doc. 6, Ex. C, pp.5-6.) In support of this claim, Stukes' trial counsel,

from the public defender's office explained that Stukes had asked counsel to try to locate some favorable witnesses, but those efforts had been unavailing, in part because the defense had been unable to find witnesses prepared to testify to information that would be favorable to the defense. (Id.) Informed that defense counsel had endeavored to find these allegedly favorable witnesses, but had been unable to locate any such witnesses, the trial judge denied Stukes' belated motions, and the case proceeded to trial.

During this trial the Commonwealth presented a compelling mosaic of proof tying Stukes to the murder of Rosalyn Denise Hearn. (Doc. 7, Ex. C.) This evidence included forensic proof, which showed that Hearn suffered hammer blows to the head, and was brutally strangled by an electrical cord, a method of killing that was entirely consistent with pre-meditated murder. (Id.) The prosecution also presented evidence concerning Stukes' spiraling pattern of domestic discord, and the domestic violence that plagued his relationship with Hearn in July of 2004. (Id.) Further, the jury learned that Stukes had fought with Hearn hours before her death, and that police had intervened to break up this domestic disturbance. (Id.)

In addition, the jury learned of Stukes' behavior in the hours and days following the murder of Hearn. (Id.) Thus, the jury heard that Stukes threatened Hearn's children on the day after their mother died, telling the children that he would

kill them if they entered the bedroom where Hearn lay murdered. (Id.) The jury also was informed that Stukes repeatedly lied to others in the day after the killing, telling one of Hearn's relatives that he did not know where Hearn was, and collecting bus fare to flee Harrisburg by lying to neighbors, and claiming that he had to leave town to care for a sick child. (Id.)

The jury also learned that when Stukes was arrested in Philadelphia, he first lied to police, telling them that he had been injured in a robbery, before confessing to a violent assaultive confrontation with Hearn, a confrontation that left him so filled with guilt that he claimed he attempted suicide. (Id.)

Finally, the jury heard from Stukes himself, who admitted in his testimony that he had lied to police and others. (Id., pp.379-516.) During his trial testimony, Stukes acknowledged a role in Hearn's death, telling jurors that he and Hearn had fought until she became "quiet." (Id.) While Stukes made these admissions, the evidence permitted the jury to conclude that other aspects of Stukes' testimony–and particularly his claims of self-defense–were a tissue of lies. (Id.) For example, while Stukes acknowledged that he restrained Hearn until she fell silent, he could not explain how Hearn came to be strangled by an electrical cord. (Id.) Similarly, Stukes alleged that Hearn assaulted him with a hammer, and claimed no recollection of striking her with this weapon. (Id.) Yet, Hearn plainly suffered head wounds caused

9

by the hammer, and the blood found of this weapon was Hearn's blood. (Id.)
Furthermore, Stukes described a violent assault by Hearn upon him in the bedroom
they shared, yet the crime scene photographs plainly contradicted this claim, since
they did not display the type of wreckage and disarray that would have resulted from
the affray described by Stukes. (Id.)

Presented with this compelling proof tying Stukes to Hearn' murder, and asked
to assess a self-defense claim made by an admitted liar, a claim that was contradicted
by physical evidence, the jury found Stukes guilty of the murder of Rosalyn Denise
Hearn. On February 18, 2005, at the close of the trial, Stukes was sentenced to life
imprisonment for his role in this murder. (Id. p.664.)

### C.   Stukes' Direct Appeal

Stukes appealed his conviction and sentence to the Pennsylvania Superior
Court. (Doc. 7, Ex. D.) On direct appeal, Stukes raised a single, narrow claim of error,
arguing that the trial judge erred when he permitted TG to testify at trial via closed
circuit television. (Id.) On October 25, 2005, the Superior Court issued an opinion and
order denying Stukes' appeal and affirming his murder conviction. (Doc. 7, Ex. E.) In
this opinion, the Superior Court followed settled case law, which permitted a child
witness to testify by closed circuit television, when the court finds that the
circumstances surrounding the testimony could harm the child's well-being. (Id.) The

Superior Court then observed that TG was undoubtedly a material witness in the prosecution of Stukes and found that the Commonwealth had thoroughly shown that TG's welfare and well-being could be harmed if he was compelled to appear before his mother's killer and relive the events of July 11, 2004. Since the procedure used by the trial judge was specifically authorized by statute, was consistent with settled case law, and was factually justified in this instance, the Superior Court affirmed the trial judge's's ruling, and sustained Stukes' conviction and sentence. (Id.)

Stukes then filed a petition for allowance of appeal with the Pennsylvania Supreme Court. (Doc. 7, Ex. F.) That petition for allowance of appeal, was rejected by the Pennsylvania Supreme Court on March 16, 2006. (Doc. 7, Ex. G.)

### D.    Stukes' State Post-Conviction Act (PCRA) Litigation

With his direct appeals exhausted, on December 5, 2006, Stukes filed a petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa. C.S.A. §§ 9541 et seq. (Doc. 7, Ex. H.) In his initial PCRA petition Stukes argued that his murder conviction was not the product of the evidence linking him to this brutal slaying, but rather was a result of the ineffectiveness of his counsel and erroneous trial court rulings. (Id.) Ultimately, over time, Stukes identified several claims of trial error and ineffective assistance of counsel which he pursued in these PCRA proceedings. (Doc. 7, Exs. H, K and L.) These claims included Stukes' assertion that his counsel erred in failing to

call an unidentified "self-defense" expert witness, and by neglecting to locate, "Mr. Metotic," a person that Stukes alleged was a former boyfriend of Hearn whom Hearn had allegedly attacked at some time in the past with a hammer. (Id.) Stukes also contended that his counsel was ineffective in failing to successfully resist the request that TG be permitted to testify via closed circuit television.(Id.)  Further, Stukes insisted that the jury selection process in Dauphin County was fundamentally flawed since it relied upon a jury pool draw from those who possess drivers' licenses, a jury venire that Stukes alleged under-represented African-Americans. (Id.)

Counsel was initially appointed to assist Stukes in these post-conviction proceedings. However, On February 21, 2007, the trial court, sitting as PCRA court, allowed Stukes' appointed PCRA counsel to withdraw after counsel submitted a "no-merit" letter pursuant to Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988) and Commonwealth v. Finely, 550 A.2d 213 (Pa. 1988), stating that counsel could discern no meritorious issues in this case. Stukes then requested leave to proceed *pro se*, which was granted on August 1, 2007, and on October 25, 2007 Stukes filed a supplement to his pending PCRA petition. (Doc. 7, Ex. I.) On August 22, 2008, the state court then conducted an evidentiary hearing regarding the claims raised by Stukes in his supplemental *pro se* petition. (Doc. 7, Ex. J.)

In the course of this hearing, Stukes was given a full opportunity to factually develop his claims. (Id.) However, this presentation actually tended to undermine many of the assertions made by Stukes in his pleadings. For example, with respect to his claims regarding racial bias in the jury selection process, Stukes admitted that he never presented these claims in a timely fashion to his trial counsel. (Id. 24.) Further, trial counsel indicated that, in fact, the jury panel reflected a broad cross section of the community and had significant African-American representation, thus rebutting Stukes' claim. (Id. 27-28.)[1]

In addition, this hearing revealed Stukes' claims regarding "Mr. Metotic" his missing witness to be, factually, an exceedingly thin reed. For his part, Stukes did not produce this witness, and acknowledged that he did not know the current whereabouts of this alleged witness, beyond asserting that Metotic lived near San Francisco, California. (Id. 19-20.) Stukes' trial counsel, in turn, stated that he had no way of confirming whether Stukes had ever provided him with the name of such a witness, and further had no way of ascertaining whether this missing witness was willing and available to testify.(Id. 30-32) According to trial counsel, if Stukes had provided him with information concerning such a witness, the public defender's office would have

---

[1]Indeed, the evidence presented at this hearing revealed approximately 17% of the venire and trial jury consisted of African-American jurors. (Id. 27-28.)

endeavored to locate this witness. (Id. 30-32.) The trial court and counsel also noted that, at the time of trial, counsel had reported that efforts to locate the witnesses requested by Stukes had been unavailing. (Doc. 7, Ex. C, pp.5-6.)

Following this hearing, the trial judge entered an opinion and order denying Stukes' PCRA petition. (Doc. 7, Ex. L, attach A.) In this opinion, the trial judge systematically addressed each of Stukes' complaints, noting: (1) that there was no error in permitting the child witness, TG, to testify via closed circuit television; (2) rejecting Stukes' various claims of ineffective assistance of counsel premised upon the failure to call various expert and fact witnesses, finding that Stukes had not shown that such witnesses were available and willing to testify; (3) rejecting both procedurally and on its merits Stukes' claim that the jury selection process in Dauphin County was unfair and biased; and (4) denying Stukes' claims that the prosecutor engaged in misconduct in her closing argument, when she suggested that Stukes acted intentionally when he killed Hearn. (Id.)

Stukes appealed this ruling to the Pennsylvania Superior Court. (Doc. 7, Ex. L), which affirmed the denial of this post-conviction petition in a written opinion filed December 8, 2009. (Doc. 7, Ex. M.) In its opinion, the Superior Court rejected each of Stukes' claims of error, reaffirming its prior decision that the trial judge properly permitted TG , the child witness, to testify via closed circuit television. In addition, the

Superior Court rejected all of Stukes' claims of ineffective assistance of counsel based upon the alleged failure of trial counsel to call various witnesses, observing that Stukes had never shown that such witnesses were available and willing to testify. (Id.) The Superior Court also held that there was nothing improper about the jury selection process employed in Dauphin County, and found that the prosecutor's closing argument, which simply focused the jury's attention on the evidence which showed that Stukes acted intentionally when killing Hearn, was completely appropriate in this murder prosecution. (Id.)

### E.    Stukes' Federal Habeas Corpus Petition

Having effectively exhausted his available state remedies, Stukes then filed this petition for writ of habeas corpus in federal court. (Doc. 1.) In his petition, Stukes presented many of the same issues which he had fully litigated in the state courts, arguing that his trial counsel was ineffective for, *inter alia*: (1) failing to call various expert and fact witnesses; (2) failing to successfully oppose the video-testimony of the child witness, TG; and (3) failing to object to the prosecutor's closing argument, which highlighted the evidence which showed that Stukes intentionally killed Hearn. In addition, Stukes renewed his complaints about the jury selection process employed in Dauphin County, arguing that this process was unfair and biased. (Id.) This petition has been fully briefed by the parties (Docs. 1 and 7), and is now ripe for resolution.

For the reasons set forth below, it is recommended that the petition be denied.

## II.   Discussion

### A.    State Prisoner Habeas Relief–The Legal Standard.

A state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which provides in part as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
> **(A)** the applicant has exhausted the remedies available in the courts of the State;
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b).

### (1.)   Substantive Standards For Habeas Petitions

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief. At the outset, a petition

must satisfy exacting substantive standards to warrant relief. Federal courts may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. See, e.g., Reed v. Farley, 512 U.S. 339, 354 (1994). Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. See Priester v. Vaughan, 382 F.3d 394, 401-02 (3d Cir. 2004).

### (2).   **Deference Owed to State Court Rulings**.

These same principles which inform the standard of review in habeas petitions and limit habeas relief to errors of a constitutional dimension also call upon federal courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings. There are two critical components to this deference mandated by 28 U.S.C. § 2254.

17

First, with respect to legal rulings by state courts, under §2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; see 28 U.S.C. §2254(d)(1); or (2) was "based upon an unreasonable determination of the facts," see 28 U.S.C. §2254(d)(2).  Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts.  See Rice v. Collins, 546 U.S. 333, 338-39 (2006); see also Warren v. Kyler, 422 F.3d 132, 139-40 (3d Cir. 2006);  Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002). As the Supreme Court has recently explained:

> If an application includes a claim that has been "adjudicated on the merits in State court proceedings," § 2254(d), an additional restriction applies. Under § 2254(d), that application "shall not be granted with respect to [such a] claim ... unless the adjudication of the claim":
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."
>
> This is a "difficult to meet," Harrington v. Richter, 562 U.S. ——, ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011), and "highly deferential

standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) *(per curiam)* (citation and internal quotation marks omitted). The petitioner carries the burden of proof. Id., at 25, 123 S.Ct. 357.

 Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).

This rule applies with particular force to habeas claims premised on the alleged ineffectiveness of counsel. In such instances we are cautioned that our review of the state court's rulings should be " 'doubly deferential.' Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413, 173 L.Ed.2d 251 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5–6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) *(per curiam)* )[in that ] [w]e [should] take a 'highly deferential' look at counsel's performance, Strickland, supra, at 689, 104 S.Ct. 2052, through the 'deferential lens of § 2254(d),' Mirzayance, supra, at ——, n. 2, 129 S.Ct., at 1419, n. 2." Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. See 28 U.S.C. §2254(e)(1). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings. See,

e.g., <u>Maggio v. Fulford</u>, 462 U.S. 111, 117 (1983) (per curiam); <u>Demosthenes v. Baal</u>, 495 U.S. 731, 734-35 (1990).

### (3.)   <u>Ineffectiveness of Counsel,  Standard of Review</u>

These general principles apply with particular force to habeas petitions, like Stukes,' that are grounded in claims of ineffective assistance of counsel. It is undisputed that the Sixth Amendment to the United States Constitution guarantees the right of every criminal defendant to effective assistance of counsel.  Under federal law, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in order to survive. Specifically, to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that:  (1) the performance of counsel fell below an objective standard of reasonableness; and (2) that, but for counsel's errors, the result of the underlying proceeding would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 691-92 (1984).  A petitioner must satisfy both of the <u>Strickland</u> prongs in order to maintain a claim of ineffective counsel.  <u>George v. Sively</u>, 254 F.3d 438, 443 (3d Cir. 2001).

At the outset, <u>Strickland</u>  requires a petitioner to "establish first that counsel's performance was deficient."  <u>Jermyn v. Horn</u>, 266 F.3d 257, 282 (3d Cir. 2001).  This threshold showing requires a petitioner to demonstrate that counsel made errors "so

serious" that counsel was not functioning as guaranteed under the Sixth Amendment. Id. Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Id. "Thus, '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011)(emphasis in original). Moreover, in making this assessment "[t]here is a 'strong presumption' that counsel's performance was reasonable." Id. (quoting Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996)).

But a mere showing of deficiencies by counsel is not sufficient to secure habeas relief. Under the second Strickland prong, a petitioner also "must demonstrate that he was prejudiced by counsel's errors." Strickland, 466 U.S. at 688. This prejudice requirement compels the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id.

Thus, as set forth in Strickland, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness." 466 U.S. at 688. "A fair

21

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689). The petitioner must then prove prejudice arising from counsel's failings. "Furthermore, in considering whether a petitioner suffered prejudice, '[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."'" Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696.). Therefore, the prejudice analysis compelled by Strickland specifically calls upon us to critically assess the strength of the government's case since "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id.

Although sometimes couched in different language, the standard for evaluating claims of ineffectiveness under Pennsylvania law are substantively consistent with the standard set forth in Strickland. See Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); see also Werts v. Vaugh, 228 F.3d 178, 203 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not

apply a rule of law that contradicted <u>Strickland</u> and thus was not 'contrary to' established Supreme Court precedent."). Accordingly, a federal court reviewing a claim of ineffectiveness of counsel brought in a petition under 28 U.S.C. § 2254 may grant federal habeas relief if the petitioner can show that the state court's adjudication of his claim was an "unreasonable application" of <u>Strickland</u>. <u>Billinger v. Cameron</u>, 2010 U.S. Dist. LEXIS 63759, at *11 (W.D. Pa. May 13, 2010). In order to prevail against this standard, a petitioner must show that the state court's decision "cannot reasonably be justified under existing Supreme Court precedent." <u>Hackett v. Price</u>, 381 F.3d 281, 287 (3d Cir. 2004); <u>see also</u> <u>Waddington v. Sarausad</u>, __ U.S. __, 129 S. Ct. 823, 831 (2009) (where the state court's application of federal law is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted). This additional hurdle is added to the petitioner's substantive burden under <u>Strickland</u>. <u>See</u> <u>Knowles v. Mirzayance</u>, __ U.S. __, 129 S. Ct. 1411, 1420 (2009) (observing "the doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard."); <u>see also</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas.").

Furthermore, in a case such as this, where a state court judgment rests upon factual findings, it is also well-settled that:

> A state court decision based on a factual determination, . . . , will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding. <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003). We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>Campbell v. Vaughn</u>, 209 F.3d 280, 285 (3d Cir.2000).

<u>Rico v. Leftridge-Byrd</u>, 340 F.3d 178, 181 (3d Cir. 2003). Applying this standard of review, federal courts are only obliged to grant habeas relief when "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact." <u>Rolan v. Vaughn</u>, 445 F.3d 671, 681 (3d Cir. 2006).

### B.      Mark Stukes  is Not Entitled to Habeas Relief

Judged against these standards, Stukes' habeas petition plainly fails since in no instance can we find that Stukes has shown that the state courts erred in their assessment of the legal issues and factual claims advanced by this Petitioner. The fundamental flaws which undermine Stukes' petition are separately addressed below:

1.   **Stukes Cannot Obtain Habeas Relief Based Upon the Fact That a Child-Witness, TG, Was Permitted to Testify By Closed-Circuit Television**

At the outset, Stukes cannot obtain habeas relief based upon the fact that a child witness, TG, testified via closed circuit television at his trial. With respect to this claim, Stukes' argument fails for at least three reasons.

First, Stukes errs when he suggests that allowing this form of testimony by a traumatized child witness violates his Sixth Amendment confrontation rights. Quite the contrary, for more than twenty years it has been abundantly clear that:

> [W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. [Thus, where] the child witnesses ... testifie[s] under oath, [is] subject to full cross-examination, and [is] able to be observed by the judge, jury, and defendant . . ., we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

Maryland v. Craig, 497 U.S. 836, 857 (1990). Given this clear pronouncement by the United States Supreme Court, federal courts have repeatedly rejected claims, like the claim advanced by Stukes here, that the "introduction of testimony through two-way closed-circuit television violates the Confrontation Clause, [holding instead that]

25

introduction of testimony by such means does not constitute an unreasonable application of clearly established federal law as determined by the Supreme Court. See, e.g., Fuster-Escalona v. Fla. Dep't of Corr., 170 Fed.Appx. 627, 629-30 (11th Cir.2006) (per curiam) (it was 'not contrary to, or an unreasonable application of, established federal law to hold that no case-specific findings were required prior to [ ] four children testifying via two-way closed television'), cert. denied, 549 U.S. 1213, 127 S.Ct. 1251, 167 L.Ed.2d 87 (2007); Harrell v. Butterworth, 251 F.3d 926, 931-32 (11th Cir.2001) ('Florida Supreme Court's decision-that the witnesses' testimony via two-way, closed-circuit satellite transmission did not violate [defendant's] constitutional rights-was neither contrary to, nor an unreasonable application of, Federal law set forth by Supreme Court cases ....')." Horn v. Quarterman, 508 F.3d 306, 318 (5th Cir. 2007).

Second Stukes' claim fails as a factual matter. Given that this practice has been expressly sanctioned by the United States Supreme Court as a matter of law, it is clear that the Pennsylvania courts did not err on these facts in concluding that allowing TG to testify in this fashion was appropriate. That factual finding by the state courts was wholly justified given the evidence presented in this case by TG, his father, his teachers, and his therapist all of whom testified regarding the fears that racked TG, fears driven by his horrific experience on July 11, 2004, as this boy discovered his mother's body, and found himself in the home with her corpse, and her killer, a killer

who questioned TG regarding whether he had been in his mother's room, and threatened to kill TG and his sister if they ventured into the bedroom where their mother lay dead.

Finally, given that the practice of permitting testimony by closed circuit television was both legally justified and factually warranted in this case, Stukes cannot obtain habeas relief by arguing that his counsel erred in failing to contest this form of testimony at trial. Indeed, it is well-settled that "counsel assistance does not become ineffective by failing to raise an issue when convincing Supreme Court case law shows it to be without merit. See Moore v. Deputy Comm'rs of SCI Huntingdon, 946 F.2d 236, 245 (3d Cir.1991) (holding that trial counsel was not ineffective for failure to object to charge that he was justified on basis of evidence)." Parrish v. Fulcomer, 150 F.3d 326, 328-29 (3d Cir. 1998).

Thus, Stukes' claims arising out of the fact that the child witness victimized by his conduct was permitted to testify via closed circuit television provide no grounds for federal habeas relief.

## 2.      Stukes' Ineffective Assistance of Counsel Claims Premised Upon The Failure to Call Various Witnesses Are Also Unavailing

Nor can Stukes set aside this conviction by simply arguing that his counsel was ineffective in failing to call certain witnesses at trial. The legal standards which govern such claims are clear.  In this context, in order to successfully assert that "counsel was ineffective for failing to call a . . .witness to testify about [some matter, a petitioner] must establish both that his attorney's performance was objectively unreasonable and that, but for the deficient performance, there would have been a reasonable probability of a different outcome. See Strickland v. Washington, 466 U.S. 668 (1984)." Reinert v. Larkins, 379 F.3d 76, 94-5 (3d Cir. 2004). In practice, therefore, "in order 'to succeed on a claim of ineffectiveness for failure to call a witness, it must be shown that: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or should otherwise have known of him/her; (4) the witness was prepared to cooperate and testify for [the petitioner] at trial; and (5) the absence of the testimony prejudiced [petitioner] so as to deny him a fair trial.' "Grundy v. Pennsylvania, 248 F. App'x 448, 453, n.3  (3d Cir. 2007)(quoting, Commonwealth v. Gonzalez, 608 A.2d 528, 532 (Pa. Super. 1992)).

In this case, the Pennsylvania courts found that Stukes failed to make this threshold showing that is essential to any ineffectiveness claim based upon the alleged

failure to call a witness at trial. These factual findings are presumed to be correct unless the petitioner can show by clear and convincing evidence that they are erroneous. <u>See</u> 28 U.S.C. §2254(e)(1). Stukes has made no such showing here, nor can he. Indeed, Stukes' claims are plainly inadequate since they involve the alleged failure to call witnesses who were either hypothetical or unavailable. For example, Stukes faults his counsel for failing to call a "self-defense" expert witness at trial. But Stukes does not identify any such expert witness who existed, was willing to testify, and possessed information which would support a self-defense theory on these facts which involved the bludgeoning and strangulation murder of the victim. Similarly, while Stukes claims that there was a witness, "Mr. Metotic," who would testify that he was attacked by the victim with a hammer, Stukes admitted that he could not locate that witness, and Stukes' counsel reported at trial and in post-conviction proceedings that he was unable to locate any witnesses proposed by Stukes who were willing or able to testify for the defense at trial. Thus, on these facts  Stukes simply has not "shown that: [1] the witness existed; [2] the witness was available; [3] the witness was prepared to cooperate and testify for appellant at trial;  and [4] the absence of the testimony prejudiced [Stukes] so as to deny him a fair trial." <u>Grundy v. Pennsylvania</u>, 248 F. App'x 448, 453, n.3  (3d Cir. 2007)(quoting <u>Commonwealth v. Gonzalez</u>, 608 A.2d 528, 532 (Pa. Super. 1992)).

"Furthermore, in considering whether a petitioner suffered prejudice, '[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."'" Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696.). In this case, an assessment of the strength of the evidence weighs heavily against Stukes' in pursuing this ineffectiveness claim. Indeed, the evidence linking Stukes to this crime was overwhelming. Stukes had a motive to harm Hearn, arising out of the dissolution of their relationship. The forensic evidence strongly supported his guilt, confirming that Hearn died after she was both strangled and beaten with a hammer. Stukes' conduct in the immediate aftermath of the killing was completely consistent with guilt. Indeed, Stukes acknowledged a sense of guilt which led him to try to take his own life shortly after he took the life of Rosalyn Hearn. Moreover, Stukes' threatening behavior towards Hearn's children, his sudden flight, his repeated falsehoods, and his final, equivocal, confession, all speak powerfully to his consciousness of his own guilt. Finally, Stukes' admissions to police demonstrated beyond any doubt that he was the instrument of Hearn's destruction, and his contention that he accidentally or inadvertently strangled and beat Hearn with a hammer are risible in light of the evidence.

In short, Stukes cannot be heard to complain that his conviction is a result of incompetent counsel. Rather, that conviction is a product of Stukes' deeds, and words, deeds and words which demonstrated beyond any reasonable doubt that Stukes was both a killer and a liar.

### 3.     Stukes' Challenge to the Jury Selection Process Also Fails

Stukes' challenge to the jury venire selection process employed in his case is also unavailing. In his petition, Stukes alleges that the state court's reliance upon drivers' license rolls to create a jury venire list was in some fashion racially discriminatory. This claim fails for at least four reasons:

First, this claim is procedurally barred since Stukes admits that he did not timely lodge an objection to the jury selection process at trial or on his direct appeal of this conviction. Certain habeas claims, while not exhausted in state court, may also be incapable of exhaustion in the state legal system by the time a petitioner files a federal habeas petition because state procedural rules bar further review of the claim. In such instances:

> If a claim has not been fairly presented to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play. A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. Federal courts may not consider the merits of a procedurally defaulted claim unless the

applicant establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).

<u>Carpenter v. Vaughn</u>, 296 F.3d 138, 146 (3d Cir. 2002)(citations omitted).

"[A] federal court will ordinarily not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus '[o]ut of respect for finality, comity, and the orderly administration of justice.' This is a reflection of the rule that 'federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds.'." <u>Hubbard v. Pinchak</u>, 378 F.3d 333, 338 (3d Cir. 2004)(citations omitted). In this case, Stukes' admitted failure to timely raise this jury selection issue on direct appeal may now procedurally bar him from belatedly litigating this claim in federal court.

Second, beyond this procedural bar, Stukes' claim fails as a factual matter since the evidence adduced at his post conviction relief act hearing affirmatively demonstrated that the jury venire in his case reflected racially diverse cross-section of the community. Indeed, the evidence presented at this hearing revealed that approximately 17% of the venire and trial jury consisted of African-American jurors. Facts are stubborn things, and in this case the facts show that Stukes' jury aptly reflected the diversity of the community in which he committed this murder. Therefore,

there is simply no factual merit to this claim that some subtle racial bias infected the jury pool in this case.

Third, Stukes' argument regarding this jury selection process is unavailing because that argument was carefully considered, and was thoroughly rejected by the state courts, which found that the jury venire selection process employed here was racially neutral and legally appropriate. Under Pennsylvania law in order to sustain a legal challenge to the composition of a jury venire, a petitioner must make a demanding three-part showing, and demonstrate:

> (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation of the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. "Systematic" means caused by or inherent in the system by which juries were selected. Craver, 547 Pa. at 28, 688 A.2d at 696 (citing Duren v. Missouri, 439 U.S. 357, 364, 366-67, 99 S.Ct. 664, 668-70, 58 L.Ed.2d 579 (1979)). Proof is required of an actual discriminatory practice in the jury selection process, not merely underrepresentation of one particular group. See id. at 27-28, 688 A.2d at 696. The defendant bears the initial burden of presenting *prima facie* evidence of discrimination in the jury selection process. See Jones, 452 Pa. at 312, 304 A.2d at 692.

Commonwealth. v. Estes, 851 A.2d 933, 935 (Pa. Super. Ct. 2004). Viewed in light of these legal guideposts, in this case the Pennsylvania courts were undeniably correct in

concluding that Stukes' paltry showing simply did not meet the exacting legal standards prescribed for jury venire bias claims.

This legal conclusion is also fatal to Stukes' federal habeas petition. 28 U.S.C. § 2254(d) compels a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). In light of this controlling legal standard, we cannot say that the state courts erred in finding that drivers license rolls could be used to draw a jury venire. Indeed, this state court ruling was entirely consistent with federal case law which has described the use of driver license rolls as a means of establishing a jury venire list as a practice "using facially neutral criteria [that] allow[s] no opportunity for subjective or racially motivated judgments." Ramseur v. Beyer, 982 F.2d 1215, 1233 (3d Cir. 1992).

In sum, since Stukes' jury venire bias claim is fatally flawed in these four separate ways, this claim provides no grounds for federal habeas relief for this Petitioner.

### 4. Stukes' Complaints Regarding the Prosecutor's Closing Argument Provide No Grounds for Relief

Finally, in his petition Stukes invites this Court to set aside his conviction due to what he views as an improper closing argument that suggested that he intentionally killed Hearn. This Court should summarily decline Stukes' invitation.

Fairly construed, the prosecutor's closing argument in this case was a deft summary of the proof, (Doc. 7. Ex. C, pp. 571-91), a summary which persuasively demonstrated that Stukes was the instrument of Hearn's demise; that Stukes was motivated by domestic discord to kill Hearn; and that forensic evidence, and Stukes' own words and deeds, demonstrated beyond any reasonable doubt that this killing was an intentional, pre-meditated act. (Id.) While Stukes may persist in denying the evidentiary inferences drawn by the prosecutor from the proof, and may disdain the persuasive power of that proof, these complaints plainly do not provide Stukes with grounds to set aside his conviction.

Instead, in order to set aside his conviction based upon the prosecutor's closing argument, Stukes must make a multi-faceted showing. First, he must demonstrate that the prosecutor's statements were improper and went beyond appropriate argument concerning the nature and quality of the evidence. But such proof, standing alone, is not sufficient to set aside a conviction. "In evaluating a claim based on prosecutorial

misconduct, '[t]he relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). '[T]he reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.' Moore, 255 F.3d at 107." Walker v. Palakovich, 280 F..App'x 212, 215-16 (3d Cir. 2008).

Here, Stukes' attack upon the prosecutor's closing argument plainly fails to meet the exacting threshold justifying habeas relief. At the outset, the Pennsylvania courts have found, and our own independent review has shown, that there was nothing improper about the prosecutor's closing argument. That argument simply confronted the jurors with the compelling persuasive power of the proof which showed that Stukes had a motive to harm Hearn; that Hearn died in a struggle with Stukes; that Stukes endeavored to conceal that killing; that Stukes lied repeatedly about all aspects of this crime; and that Stukes' final account of the crime was completely contradicted by the physical evidence, making his belated claim of self-defense unworthy of belief.

While Stukes may be displeased that the prosecutor was able to persuasively marshal this evidence, his displeasure does not translate into misconduct on the prosecutor's part. Instead, this closing argument simply reflected the persuasive power of Stukes' own words and deeds, words and deeds that tied him in a compelling fashion to this crime. Thus, Stukes has not shown any misconduct whatsoever by the prosecutor, let alone demonstrating that the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' <u>Darden v. Wainwright</u>, 477 U.S. 168, 181(1986). In short, since Stukes' guilt is a function of the proof, not the prosecutor, this prosecutorial misconduct claim fails.

## IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254, and the  Response in Opposition to this Petition, IT IS RECOMMENDED that the Petition be DENIED and that a certificate of appealability should not issue. The Petitioner is further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed

findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of April, 2011.

*S/Martin C. Carlson*

Martin C. Carlson

United States Magistrate Judge